UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL PETITION MANAGEMENT, INC.,

   *Plaintiff*,

v.

LET THE VOTERS DECIDE, LLC,

   *Defendant*.

Case No. 2:23-cv-10421
Hon.

**JURY TRIAL DEMANDED**

---

MARK J. ZAUSMER (P31721)
DANIEL I. JEDELL (P80850)
Zausmer, P.C.
Attorneys for Plaintiff
32255 Northwestern Highway, Suite 225
Farmington Hills, MI 48334
(248) 851-4111 Fax: (248) 851-0100
mzausmer@zausmer.com
djedell@zausmer.com

---

# COMPLAINT

Plaintiff, National Petition Management, Inc., by its attorneys, Zausmer, P.C., states for its Complaint against Defendant, Let the Voters Decide, LLC:

## PARTIES

1. Plaintiff, National Petition Management, Inc. ("NPM"), is a corporation organized under the laws of the State of California, with a principal place of business at 4596 Golf View Dr., Brighton, MI 48116.

2. Defendant, Let the Voters Decide, LLC ("LTVD"), is a corporation organized under the laws of the State of Florida, with a principal place of business at 52 Riley Rd. #305, Celebration, FL 34747.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and there is full diversity of citizenship between the parties.

4. Venue is proper under 28 U.S.C. § 1391(b)(2) and § 1391(d) because a substantial part of the events giving rise to Plaintiff's claim occurred in this judicial district, and because Defendant has sufficient contacts within this judicial district to be subject to the Court's personal jurisdiction.

## INTRODUCTION

5. For over thirty-five years, NPM has been in the business of providing petition circulation services for the gathering of signatures of registered voters for the purpose of ballot qualification, as it relates to initiative and referendum processes designed to allow concerned citizens to place issues directly before the voters.

6. Since 1994, NPM has successfully qualified hundreds of initiatives and referenda across the nation with a near perfect track record on its projects.

7. NPM, as well as its subcontractor, National Political Consultants, LLC ("NPC") worked with LTVD on the Unlock Michigan campaign in 2020, which was

successful. As a result, NPM and NPC worked with LTVD on the Unlock Michigan 2.0 campaign in 2021. During both of these campaigns, the terms and conditions of the parties' business agreement and relationship was set forth in the Project Nuts and Bolts, and understood and adopted by and between the parties.

8. In December 2021, NPM contracted with Let MI Kids Learn, a Ballot Question Committee organized under the laws of the State of Michigan, to gather signatures to qualify two education-related initiatives for submission to the Michigan legislature and/or Michigan voters during the November 2022 general election cycle ("Education1" and "Education2"). NPM guaranteed a validity rate for signatures of 75%, which was the same as during the Unlock Michigan campaign in 2020 and the Unlock Michigan 2.0 campaign in 2021 ("Unlock2").

9. NPM contracted with LTVD, and several other initiative managers and signatures gatherers, to gather enough valid signatures of registered Michigan voters to qualify the two Michigan initiatives for the election ballots.

## FACTUAL ALLEGATIONS

10. NPM and LTVD entered into a contract on or about November 15, 2021 for Education1 and Education2, subject to the terms and conditions set forth in the Project Nuts and Bolts for Unlock2.

11. The Project Nuts and Bolts provide that LTVD was required to call in signatures twice weekly, and deliver processed signature petitions to NPM's office,

located at 24293 Telegraph Rd., Suite 285, Southfield, MI 48033.  Upon LTVD's delivery of signatures, NPM would pay a total of $4.00 per signature.  The amount paid per signature varied during the project.  At all times, NPM expressly required a validity rate of 75% or better for signatures, and reserved the right not to pay for any signatures falling below the 75% validity rate, under its Processing Guidelines.

12. Starting in December 2021, LTVD submitted batches of signatures to NPM.  Upon delivery, NPM paid LTVD the agreed-upon price per signature for the entire batch of signatures, via ACH.

13. NPM ran its own verification system to audit the delivered signatures, in accordance with Michigan Election Law requirements.  Upon completion of its audits, NPM required reimbursements from LTVD for rejected signatures which did not meet validity requirements under Michigan Election Law ("chargebacks"), per the terms and conditions of the Project Nuts and Bolts.

14. In the parties' regular course of business as it pertained to the Michigan initiatives, the chargebacks owed to NPM would be deducted from the next payment made by NPM to LTVD for signatures delivered.  LTVD accepted the chargebacks in the ordinary course and continued to deliver the next batch of signatures.  It was often the case that LTVD delivered batches of signatures before NPM was able to complete its audit of previously delivered signatures; NPM would therefore deduct accumulated chargebacks for invalid signatures that LTVD had delivered in one or

more batches at the time of its payment for a later batch of delivered signatures. This process began in December 2021 and remained in effect through June 2022.

15. On or about January 25, 2022, Mark Jacoby, LTVD's President, flew up to Michigan from Florida and met with Lee Albright, NPM's President, *inter alia*, at NPM's Southfield, MI office, to discuss LTVD's continued work on the Michigan election ballot initiatives. LTVD also maintained an office at the same building.

16. LTVD continued calling in and delivering petition signatures to NPM for the Michigan initiatives through June 2022. At all relevant times, NPM continued to pay LTVD in full for each batch of signatures upon delivery, prior to any audit.

17. In July 2022, LTVD ceased submitting signature call-ins or delivering batches of signatures to NPM, and discontinued all communications with NPM. The outstanding July 2022 call-ins LTVD made to NPM totaled 91,668. Consequently, NPM had no way to deduct accumulated chargebacks from June 2022 to LTVD.

18. In July 2022, Jacoby took petitions containing at least 64,000 signatures for to the Michigan initiatives, and vacated his Michigan office, without delivering the signatures to NPM, holding them for ransom. LTVD intentionally withheld the remaining batches of signatures from NPM, causing NPM financial harm because it was precluded from issuing chargebacks to LTVD which totaled $645,403.00, for invalid signatures delivered during the month of June 2022, in accordance with the ongoing business relationship between the parties.

19. As a result, LTVD was, and has at all times remained, unjustly enriched in the amount of $645,403.00.

20. Upon information and belief, in late July 2022, Jacoby delivered the remaining batches of signatures to Let MI Kids Learn.  Upon information and belief, Let MI Kids Learn paid LTVD directly for delivered signatures, after its own audit. By forcing Let MI Kids Learn to pay it directly for signatures that it was obligated to deliver to NPM, LTVD breached its agreement with NPM by precluding it from issuing the remaining chargebacks to LTVD, thereby causing NPM financial harm.

## COUNT I
## BREACH OF CONTRACT

21. Plaintiff repeats and reincorporates by reference each of the preceding paragraphs as if set forth fully herein.

22. Plaintiff NPM and Defendant LTVD entered into a valid, enforceable contract, whereby, in exchange for monetary consideration, LTVD would provide services to NPM.

23. Pursuant to that contract, LTVD had an obligation to collect and deliver signatures to NPM with at least a seventy-five percent (75%) validity rate.

24. Pursuant to that contract, NPM had the discretion to reject signatures as invalid under Michigan Election Law and its Processing Guidelines, including but not limited to for reasons that the signatures were incomplete, suspicious, duplicate, or from non-registered voters, or voters outside of the applicable county, *inter alia*.

25. Pursuant to that contract, NPM would issue chargebacks to LTVD for invalid signatures delivered, determined upon NPM's audit, which LTVD accepted as deductions from subsequent payments for its deliveries of signatures in the regular course of business, by its continued performance under the parties' contract.

26. LTVD breached the contract by refusing to accept NPM's chargebacks as adjustments for invalid signatures delivered during the month of June 2022.

27. LTVD breached the contract by continually failing to deliver to NPM signatures with a validity rate of 75% or better.

28. LTVD breached the contract by falsely calling in 91,668 signatures, and refusing to deliver an actual total of at least 64,000 signatures, to NPM, in July 2022.

29. NPM fulfilled its obligations under the contract.

30. As a result of LTVD's breaches, Plaintiff NPM has suffered damages in the amount of at least $645,403.00.

31. NPM is entitled to an award of attorney fees and the costs of this action.

## COUNT II
## IMPLIED CONTRACT/UNJUST ENRICHMENT

32. Plaintiff repeats and reincorporates by reference each of the preceding paragraphs as if set forth fully herein.

33. In the alternative, if a contract does not exist between NPM and LTVD, then an implied contract exists under which compensation was made by NPM to LTVD for services rendered.

34. At all relevant times, the parties' business relationship as it pertained to Education1 and Education2 was governed by the Project Nuts and Bolts that was in effect during Unlock2, the prior Michigan ballot initiative the parties had contracted for, and the parties understood the terms and conditions of the Project Nuts and Bolts would be continuing to govern their business relationship at all relevant times.

35. Under such an implied contract, NPM provided an undeniable benefit: payment for delivered signatures towards the Michigan initiatives, prior to any audit regarding the validity of delivered signatures for compliance with state election laws.

36. LTVD had knowledge of, and voluntarily accepted and/or received, the benefit from NPM.

37. Under the circumstances, it is inequitable for LTVD to retain the benefit without giving compensation. NPM paid LTVD for all signatures delivered despite NPM's audit revealing that many signatures were invalid and subject to chargebacks, which NPM could not issue due to LTVD refusing to deliver remaining signatures.

38. LTVD breached this implied contract by retaining the benefits without providing just compensation.

39. As a result of LTVD's breach, NPM has suffered damages.

## COUNT III
## PROMISSORY ESTOPPEL

40. Plaintiff repeats and reincorporates by reference each of the preceding paragraphs as if set forth fully herein.

41. In the alternative, if a contract does not exist between NPM and LTVD, then an implied contract and/or agreement exists, pursuant to which LTVD promised that it would accept NPM's chargebacks for invalid signatures, as demonstrated by its pattern of continued performance under the parties' ongoing business agreement.

42. LTVD expected, or should have reasonably expected, to induce NPM to make payments for delivered signatures in full, upfront, based on its promise.

43. Plaintiff NPM detrimentally relied on LTVD's promise by paying it in full, upfront, for signatures LTVD delivered to NPM throughout June 2022.

44. Under the circumstances, it is inequitable for LTVD to retain the benefit without giving compensation. NPM paid LTVD for all signatures delivered despite NPM's audit revealing that many signatures were invalid and subject to chargebacks, which NPM could not issue due to LTVD refusing to deliver remaining signatures.

45. LTVD's promise to accept chargebacks for invalid signatures must be enforced to avoid injustice to NPM.

WHEREFORE, Plaintiff demands a jury trial and requests that this Honorable Court enter a judgment against Defendant LTVD in an amount of $645,403.00 with post-judgment interest at the statutory rate, award Plaintiff its reasonable attorneys' fees and costs, and grant such further relief as the Court deems appropriate.

        Respectfully submitted,

        ZAUSMER, P.C.

        */s/ Daniel I. Jedell*
        MARK J. ZAUSMER (P31721)
        DANIEL I. JEDELL (P80850)
        Attorneys for Plaintiff
        32255 Northwestern Highway, Suite 225
        Farmington Hills, MI  48334
        (248) 851-4111 Fax: (248) 851-0100
        mzausmer@zausmer.com
Dated: February 17, 2023        djedell@zausmer.com